UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WENDY AYALA,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

Case No. 16-13543
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

**OPINION AND ORDER
ACCEPTING THE MAGISTRATE JUDGE'S RECOMMENDATION [29],
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [19], AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [26]**

MBS was born about two months early. Due to medical conditions associated with his prematurity, he stayed in the hospital for about two months. Shortly after MBS got home, he experienced problems with breathing and digesting food.

Around this time, MBS's mother applied—on MBS's behalf—for supplemental-security income on the basis that MBS was disabled under the Social Security Act. In August 2015, when MBS was 24 months old, an administrative law judge issued a lengthy opinion finding that MBS was not disabled under the Social Security Act from birth through the time of his decision. When further administrative review was denied, the ALJ's decision became the final decision of the Commissioner of Social Security.

Wendy Ayala, MBS's grandmother and guardian, appealed to federal court. All pretrial matters were referred to Magistrate Judge Elizabeth A. Stafford. The Magistrate Judge has recommended that this Court affirm the decision of the Commissioner.

Ayala objects to that recommendation. Having considered anew the issues raised by her objections, *see* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3), the Court will overrule Ayala's objections and affirm the Commissioner's disability determination.

**I.**

For a child to be found "disabled" under the Social Security Act, the child's impairments must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or, in Social Security parlance, the "listings." *See* 20 C.F.R. § 416.924.

Ayala does not take issue with the ALJ's finding that MBS's impairments neither met nor medically equaled a listing. Ayala instead attacks the ALJ's finding that MBS's impairments did not functionally equal a listed impairment.

To functionally equal a listing, a child must either have "marked" limitation in two, or an "extreme" limitation in one, of the following six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) self-care, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(d).

The ALJ found that MBS had no limitation or less-than-marked limitation in all six domains. (*See* R. 23, PID 1179–93.) As most relevant here, the ALJ found that MBS had "no limitation in interacting and relating to others" and "less than marked limitation in health and physical well-being." (R. 23, PID 1189, 1193.)

The heart of Ayala's appeal (and her objections) is that the ALJ erred in rating these two domains. She claims that MBS had "extreme," or at least "marked," limitation in the domain of interacting and relating with others. (*See* R. 19, PID 1143–47; R. 30, PID 2304–07.) She makes a

2

similar claim about the domain of health and physical well-being. (*See* R. 19, PID 1138–43; R. 30, PID 2303–04.) The Court starts with Ayala's first claim.

**A.**

The interacting-and-relating-with-others domain required the ALJ to consider, among other things, how well MBS "initiat[ed] and respond[ed] to exchanges with other people, for practical or social purposes" and how well MBS related to others by "forming intimate relationships with family members and with friends [his] age, and sustaining them over time." 20 C.F.R. §§ 416.926a(i)(1)(i), (i)(1)(ii).[1] Thus, difficulty with nonverbal or verbal communication is a limitation in the domain of interacting and relating with others. *See* 20 C.F.R. §§ 416.926a(i)(3)(v), (i)(3)(vi).

To guide the ALJ's rating of this domain, the regulations describe what children at various ages should be able to do in terms of interacting and relating with others. By age one, an infant should initiate games like "peek-a-boo" with his caregivers, "begin to affect others through [his] own purposeful behavior (e.g., gestures and vocalizations)," and "begin to develop speech by using vowel sounds and later consonants, first alone, and then in babbling." 20 C.F.R. § 416.926a(i)(2)(i). And between the ages of one and three, a toddler should be able to "express emotions and respond to the feelings of others" and "spontaneously communicate [his] wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know [the toddler] can understand what [he] say[s] most of the time." 20 C.F.R. § 416.926a(i)(2)(ii).

For this domain, much of Ayala's objection is based on the results of a questionnaire she completed. When MBS was 22 months old, Ayala completed an Ages & Stages Questionnaire

---

[1] The Court has used the version of the regulations in effect at the time of the ALJ's August 2015 decision.

(ASQ) for 22 month olds. She indicated that MBS could perform all but one of the listed gross-motor skills and could do some of the fine-motor, problem-solving, and personal-social skills. (R. 23, PID 2196–98.) But in the "communication" section of the questionnaire, Ayala indicated that MBS could do none of the listed skills (point to a picture of a ball or kitty (or the like); follow simple directions such as "close the door"; point to three body parts; use at least 15 words other than "mama" and "dada"; properly use two of "me," "I," "mine," and "you"; or use a two-word phrase like "see dog"). (R. 23, PID 2195.) Ayala's responses resulted in a "communication" score of zero.

The ALJ discounted the results of the ASQ for several reasons. For one, the ALJ noted that when MBS was 19 months old, Ayala told a doctor that MBS had "mild" issues with speech. (R. 23, PID 1187, 2090.) The ALJ also thought that the results of the ASQ were inconsistent with an assessment by a family services coordinator with Early On. (R. 23, PID 1181, 1187, 1189.) (Early On is a program that helps infants and toddlers with special needs.) The Early On assessment, performed when MBS was 17 months old (15 months developmentally if accounting for the fact that MBS was born two months early), provided, among other things, that MBS was communicating at the 11.5- to 13-month level and relating to others at the 13- to 15.5-month level. (R. 23, PID 1344.) In addition to Ayala's "mild" descriptor and the Early On assessment, the ALJ also speculated that Ayala's answers to the ASQ may have been tainted by bias: "By virtue of the relationship with [MBS], the reports of [Ayala] have the potential to tend to be discolored by affection for [MBS] and the possibility of secondary gain." (R. 23, PID 1181.)

Ayala takes issue with the ALJ's decision to discount the ASQ score. She stresses that she was required to answer "objective" questions on the ASQ (e.g., "Does your child say 15 or more words in addition to 'Mama' and 'Dada'?") and implies that the Early On assessment was

4

subjective. (*See* R. 30, PID 2305.) Ayala also argues that the ASQ was supported by objective evidence, namely failed hearing tests and screenings where MBS's communication was assessed as "emerging" but not yet "competent." (R. 30, PID 2306–07.) She also implies that the ALJ failed to recognize that Early On assessed MBS when he was 17 months old yet rated his communication skills at only the 11.5-month level (on the low end). (R. 30, PID 2304–05; *see also* R. 23, PID 1244.) Finally, Ayala argues that the ALJ's assertion that her ASQ answers might have been biased was "speculative." (R. 23, PID 2306.)

Although Ayala's objection largely focuses on the ASQ, the Court will take a broader view. The ALJ's bottom line was that MBS had "no limitation" in the interacting-and-relating-with-others domain. That finding means that the ALJ necessarily (albeit implicitly) found that MBS did not have moderate—let alone marked—limitation in this domain. So for this domain to make any difference in this Court's decision to reverse the Commissioner's disability determination (or remand this case), it must be that substantial evidence does not support the ALJ's implicit finding that MBS was not markedly limited in his interactions and relations with others. In other words, the key question for this Court is not whether the ALJ was right or wrong to discount the results of the ASQ, but whether substantial evidence supports a less-than-marked limitation in the domain of interacting and relating to others.

The answer to this key question is "yes."

That is not to say that MBS did not have considerable limitations in this domain. At 11 months old, medical providers conducted a Bayley Infant Neurodevelopmental Screen (BINS) and found MBS "competent" in cognitive and fine-motor areas but only "emerging" in receptive and expressive communication. (R. 23, PID 2039.) And the very next month, MBS's mother told a medical provider that she was concerned that MBS was "not talking at all." (R. 23, PID 1555.)

At 14 months, another BINS was performed, with MBS now rated "competent" in expressive communication but still only "emerging" in receptive communication. (R. 23, PID 2064.) Then at 14 and 15 months, MBS apparently partly failed two hearing tests. (R. 23, PID 2179, 2273.) ("Apparently" because testing was limited by ear infections.) And, as discussed, when MBS was 22 months old, Ayala completed the ASQ resulting in a score of zero on communication. Around that time, MBS had tubes placed in his ears to reduce the frequency of ear infections, which, in turn, would hopefully improve MBS's hearing. But two months after the surgery, Ayala testified that "we've actually went backwards instead of forward." (R. 23, PID 1211.) She explained, "We get the same words that we've always had, and we're not getting . . . any more, and I work with him all the time. Every time I give him something, it's you know cup, cup and I repeat it. I give him food. It's food. And we just—we can't seem to get him any further in getting two words together or anything." (R. 23, PID 1212.)

That said, "marked" is not a low bar. That rating means that the child's impairments "seriously" interfere with his ability to independently interact with and relate to others. *See* 20 C.F.R. § 416.926a(e)(2)(i). And when "there are no standard scores from standardized tests" in the record, a child under the age of three will generally be found to have a "marked" limitation if he is functioning like a child two-thirds his age (or less). *See* 20 C.F.R. § 416.926a(e)(2).

With that legal standard in mind, add the following facts supporting the ALJ's finding. Nothing in the record stated that an "emerging" BINS meant that MBS was communicating at or below two-thirds his age. To the contrary, the breakdown of the BINS that MBS underwent at 12 months reflected that he was able to perform the receptive communication skills for seven to twelve month olds. (*See* R. 23, PID 2070.) And while the ASQ score of zero seems clear enough, closer inspection reveals ambiguity. For one, the ASQ only indicates that MBS could not

perform the communication skills of a 22 month old. It did not say that MBS was then incapable of the less-sophisticated communication skills of say, a 16 month old (which is still more than two-thirds of 22 months). Nor did the 22-month ASQ say that a child is severely impaired if he scores zero; instead it said that for scores below 15, "[f]urther assessment with a professional may be needed." (R. 23, PID 2200.) And there was, of course, the Early On assessment. The services coordinator provided that in the category of "Language/Communication" MBS had "mastered skills to the 11.5–13 month level" and in the category of "Relationship to Persons" MBS had "demonstrate[ed] skills at the 13–15.5 month level." (R. 23, PID 1344.) Using 13 months as something of an average of the two assessed ranges (11.5 to 13 and 13 to 15.5), means that at 17.5 months old, MBS was relating to others about as well as infants about three-fourths his age, i.e., above marked. And even using the very low end of the assessed range (11.5 months), MBS was performing just shy of a child two-thirds his age.

In sum then, the record reflects that MBS's grandmother thought that MBS was quite limited in his ability to communicate. But neither her answers to the ASQ nor any other evidence made clear that MBS was markedly limited in his ability to interact and relate with others. And the Early On assessment suggested that MBS was not markedly limited in this domain. True, Ayala was likely more familiar with MBS than the Early On coordinator, but the coordinator did visit with MBS on many occasions. (*See* R. 23, PID 2209–13, 2215–32.) In all then, the Court cannot say that the record as whole is so one sided that the ALJ's implicit finding that MBS was less than markedly limited in the domain of interacting and relating with others lacks substantial evidentiary support. *See Underwood v. Comm'r of Soc. Sec.*, 202 F.3d 270 (6th Cir. 2000) ("The substantial evidence standard 'presupposes that there is a zone of choice within which the

decisionmakers can go either way, without interference from the courts." (internal quotation marks omitted)).

**B.**

That finding means that Ayala must climb a steep hill to obtain reversal or remand. Recall that functional equivalence requires a child to be "marked[ly]" limited in two domains or "extreme[ly]" limited in one. *See* 20 C.F.R. § 416.926a(a). Ayala only attacks the ALJ's rating of two domains. And the Court just decided that substantial evidence supports the finding that MBS was less than markedly limited in the domain of interacting and relating with others. So it must be established that MBS has "extreme" limitation in the domain of health and physical well-being. But even that characterization of Ayala's task understates it some, for even if this Court thought MBS had an extreme limitation in this domain it could not reverse or remand if substantial evidence supports the contrary conclusion. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed . . . even if substantial evidence also supports the opposite conclusion. (citations omitted)).

The social security regulations lead to further appreciation of the incline. "Extreme" is "the rating [the Commissioner] give[s] to the worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). Although the regulations provide a general description of extreme (involving performance at half the child's age), they also provide a description tailored to the domain of health and physical well-being. *See* 20 C.F.R. § 416.926a(e)(3)(iv); *see also* S.S.R. 09-8p, 2009 WL 396030, at *2 ("Unlike the other five domains of functional equivalence (which address a child's abilities), this domain does not address typical development and functioning."). This tailored description of "extreme" is based on the following description of "marked": the child has "frequent" illness

8

from or "frequent" exacerbations of his impairments that result in "significant, documented symptoms." 20 C.F.R. § 416.926a(e)(2)(iv). In this context, "frequent" means the equivalent of having three exacerbations a year, each lasting for two weeks or more. 20 C.F.R. § 416.926a(e)(2)(iv). Building on this, the regulations say a child "may" have an "extreme" limitation in the health-and-physical-well-being domain if he is frequently ill from or has frequent exacerbations of his impairments that result in symptoms "substantially in excess of the requirements for showing a 'marked' limitation." 20 C.F.R. § 416.926a(e)(3)(iv). The regulations add that if a child "would rate as 'extreme' under this" definition, "[the child's] impairment(s) should meet or medically equal the requirements of a listing in most cases." 20 C.F.R. § 416.926a(e)(3)(iv).

Ayala attempts to climb this steep hill by stressing that both the ALJ and the Magistrate Judge missed a key aspect of the health-and-well-being domain: medical fragility. (R. 30, PID 2303–04.) While acknowledging that MBS's health might have improved as he got older, Ayala points out that MBS needed a lot of medical treatment to maintain his health. (*See id.*) And the regulations provide that a child who is "medically fragile and need[s] intensive medical care to maintain [his] level of health and physical well-being" is limited in the domain of health and physical well-being. 20 C.F.R. § 416.926a(*l*)(3)(v).

There is no doubt that MBS needed a lot of medical treatment to maintain his health. And there is no doubt that MBS was limited in the domain of health and physical well-being. But the question is how much: moderately, markedly, or extremely? To answer that question the Court turns to a chronological examination of the key treatment records.

At birth, MBS had very serious health issues. Indeed, he did not leave the hospital until he was over two months old. (R. 23, PID 1846.) He was diagnosed with apnea of prematurity

9

(i.e., at times MBS's breathing would stop) and was discharged with an apnea monitor and prescribed caffeine. (R. 23, PID 1418, 1846.) After being home for only about a week, MBS developed a respiratory infection which, apparently, exacerbated his apnea causing the monitor to sound many times during the night. (R. 23, PID 1847.) Thus, MBS returned to the hospital for over two weeks. (R. 23, PID 1522.) There, he was diagnosed with apnea of prematurity and gastroesophageal reflux. (R. 23, PID 1454.) Upon returning home, MBS was placed on oxygen 24 hours a day (via nasal cannula) and prescribed an increased dose of caffeine, albuterol (for wheezing), and prevacid (for his gastroesophageal reflux). (*See* R. 23, PID 1442, 1460, 1523.)

But as MBS got older, MBS's breathing and digestion issues began to resolve. When MBS was eight months old, a physician noted that MBS's bronchopulmonary dysplasia associated with hypoxia "seem[ed] to be resolving." (R. 23, PID 1462.) ("Bronchopulmonary dysplasia . . . is a chronic lung disease most commonly seen in premature infants who required mechanical ventilation and oxygen therapy for acute respiratory distress." Lauren M. Davidson & Sara K. Berkelhamer, *Bronchopulmonary Dysplasia: Chronic Lung Disease of Infancy and Long-Term Pulmonary Outcomes*, J. Clinical Med., Jan. 2017, at 1, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5294957/.) The next month, the same physician noted that MBS's gastroesophageal reflux seemed to be better controlled with a higher dose of Zantac. (R. 23, PID 1481.) Further, MBS's "apnea of prematurity ha[d] resolved." (R. 23, PID 1481.)

Around his first birthday, MBS suffered from other health issues. In particular, when MBS was 11 months old, he was admitted to the hospital for a night because of an ear infection and pneumonia (a bacterial or viral infection) that affected MBS's breathing. (R. 23, PID 1538, 1541, 1732.) Although MBS recovered from these issues relatively quickly (*see* R. 23, PID 1555,

1753), when he was nearing 13 months old he caught a virus that caused him to wheeze and cough (R. 23, PID 1753).

Still, it appears that the health issues that had affected MBS since birth were improving. When he was 14 months old, MBS underwent a two-night oximetry study. (R. 23, PID 1778.) The results were good: MBS no longer needed to be on oxygen. (R. 23, PID 1778.) Further, around this time, MBS stopped using Zantac and was "eating very well." (R. 23, PID 1772.)

From about 15 months through about 20 months, MBS's health issues included his ongoing bronchopulmonary dysplasia, five ear infections, eczema, gastroenteritis (with some vomiting and diarrhea), conjunctivitis (pink eye), and tonsillitis (inflammation of the tonsils). (*See* R. 23, PID 1894, 2090, 2094–96, 2181–82.) MBS's bronchopulmonary dysplasia was being treated with a bronchodilator (albuterol), inhaled steroids (QVAR), and a medication to prevent future viral infections (SYNAGIS). (*See* R. 23, PID 1894, 2182.) The frequent ear infections were treated with the placement of tubes. (R. 23, PID 2091–93.) At MBS's 15-month checkup, Ayala said that, since the prior visit, MBS's general health had been good. (R. 23, PID 1893.) She said the same at MBS's 18-month checkup. (R. 23, PID 1883.) But when MBS was 20 months old, he was treated for the gastroenteritis, conjunctivitis, and tonsillitis. (R. 23, PID 2094–96.)

When MBS was 22 months old, Ayala testified before the ALJ in this case. She explained MBS's speech issues (R. 23, PID 1212), that MBS was overweight (likely due to the steroids for his lungs) (R. 23, PID 1213), that MBS had an issue with a stomach muscle (R. 23, PID 1213), that if MBS got too active he would need nebulizer treatment (R. 23, PID 1214), and "we don't even have solid poop yet[;] [w]e still have baby" (R. 23, PID 1217).

11

That summary reflects that MBS perhaps had marked limitation in the domain of health and well-being. As Ayala correctly points out, MBS had frequent health issues that required a lot of medical care. Still, by the time MBS was nine months old, his apnea had resolved and his gastroesophageal reflux and bronchopulmonary dysplasia had improved. And it appears that MBS's apnea and gastroesophageal reflux eventually completely resolved. MBS's breathing issues continued to persist through the disability period, but they were ultimately managed through the use of inhalers. Once MBS reached 14 months, his primary health issues were infections (primarily ear infections) on essentially a monthly basis. Still, at his 15- and 18-month checkups, Ayala described MBS's health as generally good. (R. 23, PID 1883, 1893.) In all then, the Court does not believe that the record so strongly demonstrated that MBS was "extreme[ly]" limited in the domain of health and well-being—whether that domain is rated based on medical fragility or otherwise—that substantial evidence does not support the opposite conclusion. *See Cutlip*, 25 F.3d at 286.

## II.

In short, Ayala has not shown that substantial evidence does not support a less-than-marked limitation in the domain of interacting and relating with others. And Ayala has not shown that substantial evidence does not support a less-than-extreme limitation in the domain of health and physical well-being. As such, Ayala has not shown that the ALJ's determination that MBS's impairments did not functionally equate a listing amounts to reversible error. Thus, the Court ACCEPTS the Magistrate Judge's recommendation and AFFIRMS the Commissioner's finding that MBS was not disabled under the Social Security Act from the time of his birth until

he was two-years old.

       SO ORDERED.

s/Laurie J. Michelson       
LAURIE J. MICHELSON

Dated: March 30, 2018          U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

       The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 30, 2018.

s/Keisha Jackson     
Case Manager